## SMITH *v.* STATE.

## Opinion delivered May 7, 1906.

1. APPEAL—INVITED ERROR.—When defendant's counsel in a murder case asserted the innocence of a witness introduced by defendant, who had been indicted for the murder of deceased's brother, killed at the same time with deceased, it was not error to permit the prosecuting attorney to make a statement in his argument, in effect, that the witness would be shown to be guilty. (Page 30.)

2. WITNESS—IMPEACHMENT.—Where two brothers were killed in the same rencounter with defendant under precisely the same circumstances and at almost the same time, it would not be improper, in a prosecution of defendant for the murder of one of the brothers, to permit the State to prove that defendant's principal witness was jointly indicted with defendant for the murder of the other brother. (Page 31.)

3. TRIAL—ARGUMENT—EXPRESSION OF OPINION.—It was not prejudicial error to permit the prosecuting attorney to refer to defendant's principal witness, who had been indicted for complicity in the contemporaneous murder of deceased's brother, as the friend and accomplice of defendant, being merely the expression of an opinion, and there being some evidence to support such a conclusion. (Page 32.)

Appeal from Nevada Circuit Court; *Joel D. Conway,* Judge; affirmed.

#### STATEMENT BY THE COURT.

· Appellant, a negro, and the Gleghorn brothers, John and Count, white men, lived near each other in Nevada County. On the 28th of March, 1905, John and Count Gleghorn were clearing new ground. They had assisting them a negro named Will Preston. On the morning of the above day, a neighbor saw appellant leaving his home running. He looked like he was scared, had a slicker on his arm and a pistol in his right hip pocket. On being asked what was the matter, he replied: "Me and Mr. Count and them got into it." The witness making the inquiry immediately ran to where the Gleghorns were, about a quarter of a mile distant. He found Count Gleghorn dead, and John shot. John said he was shot in the breast, and would not live an hour. The witness asked him "What it came up about," and he said: "Squire Smith accused us of stealing his dog, and swapping it off; but we never did it. He came up with the hand on his pis-

tol, and I struck at and missed it, and he shot me." John lived but a little while after making this statement.

Appellant had lost his dog. He said to a witness on Sunday, before the killing on Tuesday, that: "Count and the Gibson boy got his dog and traded it off. He didn't want them fooling about his dog. He didn't want to do anything. If they would let him alone, he would let them alone. He wasn't going to raise a kick, but they had better let him alone. He wanted to let them know he knew where his dog was and could go to it. He wasn't going to raise a kick, but they had better let him alone. He wasn't married to this country."

Another witness heard him say on Tuesday, a week before the killing, and again on Monday, the day before the killing, "that Count and John Gleghorn got his dog. They were going to keep on until somebody gets killed over this dog."

Another witness heard him say on Sunday before the killing that "Count Gleghorn took his dog down and traded him to a negro, and gave him $2 to boot." The witness said to him: "This is a white folks' government, and you can't afford to accuse them of stealing a dog." He replied: "Well, professor, if they get in my road, I will tell them about it; but, if they don't, I won't." The witness said to him: "Squire, you leave that dog business alone," and he replied: "I ain't married, or tied, to this country." To another witness, a short time before the killing, he said: "He was going to have his dog, or have trouble over it." The physician who examined the dead body of John . Gleghorn testified that he found a bullet hole just to the left of the breast bone between the second and third rib. The bullet went straight in, and did not come out. The bullet caused John Gleghorn's death. The physician saw no other marks of violence on John Gleghorn's body.

Appellant was indicted for the killing of John Gleghorn, the indictment in apt terms charging appellant with the crime of murder in the first degree. He was tried, and convicted of the crime charged. On behalf of the State the evidence was substantially as above recited.

On behalf of appellant, witness Will Preston testified substantially as follows: "I was working for John and Count Gleghorn, and saw the difficulty under investigation. Defendant

came to where we were working, and John Gleghorn asked him if
he had found his dog. He replied that he had not, but that he
had heard that Count Gleghorn and the Gibson boy had swapped
his dog off. They denied it, and defendant said that he didn't
come there to see them about the dog, but about the timber on
the line. John Gleghorn said, 'That is not what you came for,'
and he picked up a pine knot and caught defendant in the collar
and commenced striking him. After he had struck several licks,
Count Gleghorn ran up with an ax, like he was going to make a
lick or throw it. Defendant shot John, and then shot Count.
Count fell. John fell on the other side, 'on his hunkers like.'
Both John and defendant had hold of the pistol, and I started
toward them. The pistol was pointed at me, and the defendant
snapped it a time or two. When John was down, defendant had
his left foot on his breast. John was up on his 'hunkers,' holding
the pistol, and I walked up and told him to turn loose, and he
did so, and fell back. I caught him, and with my assistance he
got on his feet and started toward the house, but after he had
walked ten or fifteen feet he gave down, and could go no further.
I got some blood on my hands assisting him. I looked back, and
defendant was going off with John's hat. I called his attention
to it, and he came back and got his own. I then ran to the house
and told John's wife, and went for Doctor Waddell, and when I
got back John was dead."

On cross-examination the witness testified: "We were all
working in the new ground when the defendant came up. Count
Gleghorn and I were using the ax, and John was piling brush.
Defendant came up from a northerly direction, and stopped about
ten or twelve feet from Count. Both Count and John were south
from him, Count being a little further away. I do not know
whether Count threw the ax, or whether he struck with it. When
he made this lick, defendant shot him."

"Q. How far from where John was standing with his hand
in defendant's collar to where Count lay after he fell?

"A. About three or four feet, I think.

"Q. How came the defendant on the ground?

"A. I don't know unless John threw him; they all fell wher
he shot.

"Q. Did Count throw the ax before he fell, or after?

"A.   Before defendant shot.   When he went to make his lick, or throw the ax, defendant commenced shooting.   Defendant and John were standing when Count threw the ax.   Defendant shot John first, and shot Count as he ran up with the ax. When defendant fired, they all fell, Count falling across defendant's breast.

"Q.   How could he fall across defendant's breast and John have his hand in his collar?

"A.   I don't know how he fell, but he fell right across his breast.   Defendant fired four times.   I saw no blood on defendant from licks given him by John."   The witness Preston further testified "that he did not tell Will Cantley, when he was catching the mule, that Squire Smith came up and accused these boys of stealing his dog, and raised a difficulty, and killed Count and shot John."   He also testified that four shots were fired.

The State, without objection, introduced, in rebuttal, Will Cantley, who stated that Will Preston told him on the day the shooting occurred, while he was trying to catch the mule to go for the doctor, that "Squire Smith accused them of stealing his dog. He came over there and raised it, and John started on him with a pine knot, and Squire shot Count, and then shot John."   He also testified, without objection of appellant, that Will Preston stated that only two shots were fired.   Other witnesses were called whose testimony tended to contradict the testimony of Will Preston in several particulars.

There were no objections to the court's instructions.   The prosecuting attorney, in his opening statement to the jury, said, in speaking of the witness Will Preston, "that he was a witness for the defendant, and that he was under indictment for the killing of Count Gleghorn."

The attorney for the defendant, in his opening argument to the jury, said:   "While it is true that Will Preston has been indicted for the killing of Count Gleghorn, yet the evidence will show that he had nothing to do with the killing, and that he has been indicted for the purpose of discrediting his testimony."

The defendant's attorney, in his argument to the jury, discussing the credibility of the witnesses, their interest in the case, etc., said:   "While its witness, Will Preston, is indicted jointly with the defendant for the killing of the other man, Count Gleg-

horn, yet I believe on his trial the proof will show that he had nothing whatever to do with it."

Counsel for the State, in closing his argument, referred to the above argument and statement of the defendant's counsel, and said: "Mr. Bush tells you that he does not believe Will Preston had anything to do with the killing of Count Gleghorn, and that the proof will show it on his trial. I believe when he is tried the proof will show that he is as guilty as the other defendant." To this statement appellant objected and excepted.

Counsel for the State, in his closing argument to the jury, used the following remarks:

"Why, the defendant has taken into his hands the law; he makes himself judge, jury and executioner, and says the people be damned. And who said he struck the defendant? It was his friend and accomplice (meaning Will Preston). And, now, gentlemen, what does your verdict in this case mean to Will Preston? It means the probable punishment that you mete out to this defendant." The prosecuting attorney, further discussing the testimony of the same witness, Will Preston, and the fact that that witness had blood on his hands, said: "No, sir; he will have to account for that blood yet." The same attorney, speaking of the testimony of Will Preston, stated the following: "Will Preston testified that Count Gleghorn struck at the defendant with an ax, and the force of the blow carried the ax out of his hands." Further: "And the proof will show in the trial of Will Preston that the shot that killed Count Gleghorn was not fatal." Further in the same speech the prosecuting attorney said: "I believe that all men who commit murder expect to be hung, and this human vulture and demon expects to be hung for it." Further: "Gentlemen, when you return a verdict of less than murder in the first degree in this case, you throw down the license to everybody in this county to commit the same crime." To these several remarks the appellant objected at the time they were made, and saved his exceptions to the court's ruling in permitting same.

*J. O. A. Bush,* for appellant.

The prosecuting attorney ought not to have told the jury that the witness Preston was indicted for the murder of Count Gleghorn. In response to this statement it was the duty of appel-

lant's counsel to try to remove the prejudicial impression created thereby. His statement of the innocence of the witness did not justify the prosecuting attorney in declaring that he would prove his guilt. 63 Iowa, 133. It is the duty of the prosecuting attorney to see that the defendant shall have a fair and impartial trial, that he be convicted only by competent evidence, and to secure this he should himself be fair and impartial. 12 Cyc. 571, *et seq.;* 78 Cal. 317; 71 Pac. 608; 64 Mich. 702; 59 Mich. 550; 138 Cal. 467; 67 Ark. 369; 62 Ark. 516; 65 Ark. 475; 70 Ark. 179; 168 U. S. 398; 97 Tenn. 452; 157 Mo. 360; 127 Ind. 494; 86 Iowa, 698; 107 Ky. 354; 99 Ill. 123; Thomp. on Trials, § 963 *et seq.;* 95 Ill. 394; 68 Ala. 476; 103 Ind. 133; 12 Mo. App. 431; 15 Tex. App. 501; 11 *Ib.* 391; 74 Ala. 386; 66 Ala. 48; 68 Ala. 476; 162 N. Y. 520; 55 N. Y. App. Div. 372. The case should be reversed because of other intemperate and prejudicial language used by the prosecuting attorney.

*Robert L. Rogers, Attorney General,* for appellee.

It was proper for the attorneys on both sides to comment upon the credibility of the witness; and since appellant's counsel did it, he can not complain that the prosecuting attorney did the same thing. 75 Ark. 350. The circumstances of each case must determine how far the prosecuting attorney may go in expressing his opinions and conclusions as to the facts. 71 Ark. 406. As between the witness and the dying man, it was but reasonable that the jury should accept the statement of the latter, rather than that of the former, who was under indictment for the same offense.

WOOD, J., (after stating the facts.) Learned counsel for appellant insists that the cause should be reversed on account of the improper remarks of counsel, but the record presents nothing in this respect, when the remarks of counsel for appellant as well as counsel for the State are all considered, that can be said to be prejudicial.

1. When counsel for the State in his opening statement to the jury asserted that Will Preston was under indictment for the killing of Count Gleghorn, appellant made no objection, and did not ask afterwards to have the remarks withdrawn from the jury, and the jury instructed not to consider them. Appellant chose to concede the fact as stated by the prosecuting attorney, and to

answer same by saying that the evidence will show that Preston had nothing to do with the killing, and that he had been indicted for the purpose of discrediting his testimony, rather than to object to the remark at the time and ask the court to instruct the jury not to consider same. Having taken this method of disposing of the remarks in the trial court, appellant must be held to have waived the error and prejudicial effect, if any, of such remarks before the jury. Likewise, after appellant's counsel had stated in his argument to the jury that "the evidence will show that Will Preston had nothing to do with the killing," appellant could not complain that the counsel for the State answered the argument by saying: "I believe when he is tried the evidence will show that he is as guilty as the other defendant." The same may be said of the remark of the prosecuting attorney that "the proof will show in the trial of Will Preston that the shot that killed Count Gleghorn was not fatal." These latter remarks involved an inconsistency, a contradiction in terms and, literally speaking, really meant nothing. But if the State's counsel meant by them, as seems probable, that Will Preston had something to do with the killing of Count Gleghorn, it was not error of which appellant could complain, because his counsel had invited such argument by stating that "the proof in the trial of Will Preston would show that he had nothing whatever to do with the killing of Count Gleghorn." The counsel for appellant, it appears from the record, made the first reference as to what the proof would show in the trial of Will Preston. Whatever the prosecuting attorney said with reference to that was no more in effect than saying that on the trial of Will Preston for the killing of Count Gleghorn the proof would show that he was guilty. It was improper, of course, to refer to what the proof would show on another trial. But counsel for the State did not state any specific fact that the proof would show in the trial of Will Preston tending to connect him with the murder of Count Gleghorn. He simply answered the general statement of the counsel for appellant that Will Preston would be shown to be innocent by the general statement in effect that he would be shown to be guilty.

But since John and Count Gleghorn were killed in the same rencounter with appellant, under precisely the same circumstances and almost at the same time, we do not think it would have been

improper for the State to prove that Will Preston was jointly in-
dicted with appellant for the murder of Count Gleghorn. It was
impossible to develop the circumstances of the killing of one
without the other. The two offenses were practically one and the
same. The fact that Will Preston was jointly indicted with ap-
pellant for the killing of Count Gleghorn, which appellant's coun-
sel conceded to be true, was a matter proper to be considered by
the jury in passing upon the credibility of the witness Preston.
The fact of such indictment would tend to show that he had an
interest in the result of the verdict on the trial of appellant.

2. It was also not improper, we think, for the prosecuting at-
torney, under the proof disclosed by the record, to refer to Preston
as the "friend and accomplice" of appellant. That was only the
expression of an opinion upon the part of the prosecuting attorney
that such was the fact. There was very little evidence, if any,
tending to show that Will Preston was an accomplice of ap-
pellant, but the proof was all before the jury, and as intelligent
men they could not be prejudiced by the conclusion of the pros-
ecuting attorney that Will Preston was an accomplice, if there
was no evidence before them to justify such opinion or conclusion.
The mere opinion of counsel in argument, not warranted by proof,
is not likely to make an impression upon the mind of an intelligent
juror.

The witness Preston gave, it appears, conflicting accounts
of how the fatal rencounter began, which was the most vital point
of inquiry in the case. In the account he gave to witness Cantley
(according to that witness) on the day of the killing and in a very
short time thereafter, he made appellant the aggressor, saying that
"Squire Smith accused them of stealing his dog. He came over
there and raised it," etc. But on the witness stand his testimony
tended to exonerate appellant entirely, and to show that the
Gleghorns were the aggressors, and that appellant acted only in
self-defense. He stated also to another witness shortly after
the killing that only two shots were fired, while on the witness
stand he stated that there were four. He had blood on his hands,
and gave conflicting statements as to the manner of getting same
on his hands. These and other seeming contradictions in his tes-
timony doubtless led the prosecuting officer to conclude that he
was the "friend and accomplice" of appellant; and while we think

the declaration that Preston was the accomplice of appellant was hardly warranted by the proof, yet we do not consider the expression of such opinion or conclusion on the part of the district attorney in argument as prejudicial error.

We have carefully examined the other remarks complained of, and do not find any of them obnoxious to the rule often announced by this .court prescribing the bounds for legitimate argument. See *Kansas City Southern Ry. Co.* v. *Murphy,* 74 Ark. 256, where the cases are collated. While some of them, especially those denunciatory of appellant personally, are in bad taste, yet they do not so far offend in this direction as to indicate that the jury were likely to be prejudiced by them.

3. The jury might have found from the evidence that appellant, full of malevolence towards the Gleghorns on account of a fancied wrong which they had done him, deliberately sought them out on their own premises, where they were at work, provoked them to combat, and shot them to death. His previous ill-tempered declarations in the nature of threats against the Gleghorns, and the dying declaration of John Gleghorn, fully warrant the jury in finding appellant guilty of murder in the first degree.

Judgment affirmed.