## HAMER *v.* STATE.

### Opinion delivered July 8, 1912.

1. RAPE—EVIDENCE—COMPLAINT BY PROSECUTING WITNESS.—It is competent, in a prosecution for rape, for the prosecuting witness to testify that she made complaint of the crime to her brother's wife the night of its occurrence; but the details of the complaint are not admissible,

except to corroborate the witness when the complaint is attacked, unless it constitutes part of *res gestae*. (Page 613.)

2. JUROR—DISQUALIFICATION—PREJUDICE.—When defendant accepted a juror without questioning him as to his impartiality or availing himself of the means afforded for ascertaining whether he was impartial, he will not be heard to complain after verdict that the juror was incompetent because of prejudice. (Page 613.)

3. TRIAL—AMENDMENT OF VERDICT.—A jury may amend their verdict to conform to their finding and may put it in proper form any time before they have separated and same has been entered of record and the jury discharged. (Page 614.)

4. APPEAL AND ERROR—HARMLESS ERROR.—One convicted of an assault with intent to commit rape can not complain because the evidence warranted a conviction of rape. (Page 615.)

5. CONTINUANCE—SHOWING OF DILIGENCE.—A continuance for the absence of witnesses was properly refused where no showing was made of diligence to secure their attendance; also where their testimony would have been cumulative merely. (Page 615.)

Appeal from Jackson Circuit Court; *R. E. Jeffery*, Judge; affirmed.

STATEMENT BY THE COURT.

Appellant, Vol Hamer, was indicted for the crime of rape, alleged to have been committed upon the person of Charlie Holder, a seventeen-year-old girl. She was the half-sister of appellant's wife, and had been living with them since she was a small girl. His wife was sick and away from home at the time, leaving there appellant, Charlie Holder, and two of the children.

On the morning of the day upon which the rape was committed, in the evening, appellant sent these two children to the home of Will Beard, the brother of Charlie Holder. She went to church with Crawford Blakeley and Jesse Churchill, in a buggy, and, returning in the afternoon, got out of the buggy at appellant's home at about 5 o'clock. Blakeley left his coat with her to be called for on his return, as he had to take the buggy to town and walk back, after taking Miss Churchill home. She went from there to the McNeeces to take supper with them, and appellant was also there. They ate supper, and then went back to appellant's house after sundown. She put away the milk and let down the windows and shut the doors on account of a storm approaching and then went to the room occupied by her regularly to retire.

Appellant said he believed he would go to bed and went to his room.

The prosecuting witness said that, after she had gone to bed, appellant came into her room in his night shirt and asked her to scratch his back, giving no reason why, but she knew he had been hauling logs and thought he had gotten chiggers on him. She got up and was sitting on the side of the bed, and he was kneeling down by the side of it, and she scratched his back. He said nothing afterwards, but grabbed her and threw her back on the bed, and then got on the bed with her. She remonstrated with him, begged him to turn her loose, reminded him of his wife and children, and told him that he ought to be ashamed of himself, and he said, "Damn them, I don't care anything about them or anybody else." He was over her at the time, and had hold of her hands, and she was lying on her back and fighting him and trying to get away. After the struggle, she turned faint and sick, and he carried her out into a little hall, and put her in a chair and went to his room for some camphor. She tried to get out of the front door, but he heard her and came back and jerked her loose from the door, and set her down in the chair, and then carried her on to the back porch. He rubbed the camphor on her face, and when she felt better he carried her back into his room, threw her on the bed and ravished her again. She stated that she resisted and fought all she could, and was trying to scream and make an outcry during the whole time, and "when I said he raped me I meant he had sexual intercourse with me. Yes sir, a part of his person entered my person. I finally got away from him, and went out into the little hall, and he asked me if I was going to tell it. I told him I didn't know but what I would. He said, 'Are you going to tell Will?' and before I had time to answer he said: 'If you tell anybody, I will kill you,' and told me to go to bed. Will Beard is my half-brother. I went back to bed in my own room because I was scared not to, stayed in there a few minutes, went back on the back porch to get a drink of water, and thought I would run off to Will's. He wanted to know who it was as I went by the door, and I told him. He asked what I was doing, and I told him I was getting a drink of water, and he told me to go back to bed. I went back to bed, and later got up and went

out in the hall, and stood there a while and listened until he was asleep, and then went out in the back yard and on over to Will's. I didn't have on anything, except some stockings and my night gown." She passed two other houses in going to her brother's, and upon arrival there appeared very much agitated, and told her brother and his wife that Vol had ruined her. Will Beard and his wife, and Crawford Blakeley who was staying at Beard's house, and the prosecuting witness went to Frank Parrish's, where she stayed, while the others went to town. She remained in bed until Tuesday afternoon. She stated: "The places where I was hurt when Vol Hamer was trying to have sexual intercourse with me were a place on my right arm up above my elbow, a blue spot on my throat where he choked me, and a blue spot over my left breast up above the breast, and some of my ribs on my right side were fractured, and my left hand was hurt, and my female organs were hurt." ·

Doctor Willis testified that he had been in the practice for twenty-six years, and had known Charlie Holder since she was a little girl; that he examined her on Monday morning, July 18; her pulse was 109, the normal being 72 to 74, and her temperature was below normal. "She was cold. I found a bruise over her left breast. It was blue, swollen and discolored some. After getting a history of the case, when I started to make an examination of the genital organs, I noticed there was some blood running from them. I examined inside the vagina by using the speculum, and there I found lacerations in the lining of the vagina; it was torn and bloody, and back in the vagina I found some semen that I removed, and examined some of it under a microscope and found it contained male spermatozoa. Yes, sir; there was something there to indicate sexual intercourse: the male spermatozoa and the lacerated condition of the lining of the vagina. I believe the left side was bruised. She complained of considerable pain in the left side. The hymen was perforated and open. On the 20th her temperature was still above 100, and her pulse 98. Upon a closer examination, I found a fracture of the sixth rib on the same side as the breast was bruised on." The doctor said some of the spermatozoa was still alive, he thought.

Will Beard's wife stated that she and her husband re-

turned home Sunday night, with Hamer's two little girls, shortly after the night service, about 10 or 11 o'clock, and found Crawford Blakeley in bed.     That, while Will was still at the barn unhitching the horses and she was just ready to go to bed, Charlie Holder came in.     That she was in her night gown, and looked like she was scared nearly to death.     She reported what had taken place.     The next morning Mrs. Beard examined her clothes, and found what looked to be three or four spots of blood.

Appellant testified that he and Charlie Holder ate supper at the McNeeces's on Sunday evening.     That he had taken his two children to Will Beard's that morning to go to church with them, and that soon after supper Charlie Holder remarked that they would better go home and let down the windows, and McNeece and his wife said that it would be a good while before the storm broke, and they stayed and talked for something like an hour.     That she persisted in going, and got up and started to go, although Mrs. McNeece insisted on her staying all night, to which she replied that she couldn't; that she had to go home and get breakfast, "and I said that she could stay all night if she wanted to, and I would get breakfast myself or could come down there.     She wouldn't stay; so we went home, and when we got there she asked me if I had a match, and I got one and lighted the lamp in her room. I then lighted the lamp in my room.     It was thundering and lightening, and I disconnected the telephone to keep it from burning out the batteries, and then went to my room, and pulled off my shoes and clothes, and went to bed, and the next thing I knew I heard some one knocking on the door at sunrise. I told them to come in, and, as my pants were lying on the trunk at the right of the door as you come into my room, I got there and looked around the corner, and saw Mr. Neal. I knew he was the sheriff, and I couldn't imagine what he was doing there unless it was to summon me for a witness in the Will Beard and Annie Beard case.     And pretty soon after I looked out Will Beard drawed a gun on me, a pistol, and I didn't know what to think about it.     I stood there a moment, and I saw he was going to shoot.     I jumped or dodged back, and as I stepped back he shot, and the bullet went into the door facing even with my ear, and Sheriff Neal came on up to

the door, and I asked him what was the matter, and he told me to consider myself under arrest, and I told him: "All right." I was not in Charlie Holder's room any more after I lighted the lamp. Did not go in there and ask her to scratch my back. Did not go in her room any more that night. Did not ravish her or take her in my room and ravish her at that time or at any time during the night. Did not grab her and throw her back on the bed and rape her. Did not carry her out in the hall or bathe her face with camphor, or pull her back from the front door. If she tried to get out of the front door, I did not know anything about it. I didn't know she was up at all. Did not have anything to do with Charlie Holder in the way of carnal knowledge or intercourse that night or any time. Was not off the bed at all from the time I went to bed until the sheriff came. Never had sexual intercourse with her. Did not take hold of her, or choke her, or put my hand over her mouth, or tell her not to holler."

Some remarks of the prosecuting attorney were objected to and objections were also made to the testimony of Charlie Holder that she made complaint of the crime to her brother's wife and stated that Vol Hamer had ruined her.

The jury returned the following verdict: "We, the jury, find the defendant guilty of assault and attempt to rape and fix his punishment at ten years in the penitentiary. G. H. Goatcher, Foreman."

The court said, "Gentlemen of the jury, the form of your verdict is, 'We, the jury, find the defendant guilty of assault and attempt to rape and fix his punishment,' etc. Do you mean by that that you intend for your verdict to be: 'We, the jury, find the defendant guilty of assault with intent to rape,' etc.; is that what you mean?" Jurors: "Yes, sir." Court: "Let that be written in the verdict by the foreman."

The foreman then erased the words, "and attempt," and wrote into the verdict the words, "with intent" and the clerk then read the amended verdict to the jury as follows: "We, the jury, find the defendant guilty of assault with intent to rape, and fix his punishment at ten years in the penitentiary. G. F. Goatcher, Foreman." At the request of the defendant, the jury was polled, and each answered that this was their verdict. From the judgment the defendant appealed.

*Jones & Campbell,* for appellant.

1.   The evidence of the prosecutrix is conflicting.   Her story is not at all convincing.   33 Cyc. 1485.

2.   Leading questions were improperly allowed, and acts and declarations not part of the *res gestae* improperly admitted.   66 Ark. 264, 268-9.

3.   Where scientific men are called as witnesses, they can not give their opinions,   * * *   but only their opinions upon the facts proved.   1 Greenl. on Ev., § 440, 461.

4.   Improper arguments and conduct of the prosecuting attorney were prejudicial and reversible error.   77 Ark. 19; 72 *Id.* 461; 75 *Id.* 577.   A mild rebuke is not sufficient.   115 Ind. 270; 128 Ill. App. 181; *Ib.* 128.   The additional argument was unwarranted and an unfair advantage.   13 Cal. 581; 55 Conn. 17; 10 Atl. 161; 97 Ga. 346; 65 S. E. 814.

5.   The court should not have suggested a change in the verdict, nor have allowed the change.   106 N. W. 531.

6.   The juror, Carnes, was disqualified.   19 Ark. 156; 143 S. W. 1075.

*Hal L. Norwood,* Attorney General, and *Wm. H. Rector,* Assistant, for appellee.

1.   The guilt of appellant was for the jury; they have settled it.

2.   No prejudice resulted from the so-called leading questions.

3.   Objections to a question and answer must be specific. If part is competent and part incompetent, objections will not be sustained if they go to the entire matter.   15 Ark. 345; 18 *Id.* 392; 48 *Id.* 177; 65 *Id.* 107; 14 *Id.* 438; 25 *Id.* 380.

4.   The argument of the state's attorney was not improper. The verdict was properly corrected.   32 Ark. 585; 13 Cyc. 1892.

5.   Juror Carnes was not disqualified.   19 Ark.   156.

Kirby, J., (after stating the facts).   It is insisted, first, that the court erred in permitting the prosecuting witness to state that she made complaint of the crime that night to Mrs. Will Beard, her brother's wife, upon reaching his house, saying: "Yes, sir, I told her that Vol Hamer had just ruined me; that was all I could tell her."

The court refused to exclude this answer from the jury.

It had before, when the question was asked witness what she did upon going to her brother's house, told her not to go into details. The fact that she made complaint of the crime was admissible under the circumstances of the case, and she was admonished by the court not to go into details and did not do so. The details of the complaint are not admissible, except in corroboration of the testimony of the prosecuting witness when it is attacked; unless it constitutes part of the *res gestae.* *Williams* v. *State,* 66 Ark. 264; *Skaggs* v. *State,* 88 Ark. 74.

We do not think the statements of the prosecuting attorney, objected to, transcended the bounds of legitimate argument in the presentation of the case to the jury, nor that the court abused its discretion in permitting him to take two minutes more in his concluding argument than the time allotted each side for argument of the case when it was begun. This was a matter within the discretion of the court; and, unless an abuse of that discretion is shown or some prejudice resulting to the defendant on account of it, the verdict will not be disturbed on appeal.

It was also alleged as one of the grounds for a new trial that one of the jurors, Felix Carnes, had formed and expressed an opinion of defendant's guilt before he was selected as a juror, of which fact defendant was not advised until after the rendition of the verdict. In support thereof affidavits were filed, in one of which the affiant stated that he had talked with the juror about the case some time before the trial, and that he, Carnes, said, he would like to be on the jury, and if he was he would break defendant's neck.

The court examined the parties who made the affidavits, as well as the juror complained of and others relative to the matter. One of appellant's attorneys testified that the juror, Felix Carnes, was not a member of the regular panel, and that he knew nothing of him being summoned as a juror until he was called; that Carnes was examined, and on his *voir dire* stated that he did not know Vol Hamer, the defendant, was not acquainted with him, and knew nothing about the facts in the case, and that he had no other information of the juror, Carnes, until after the trial was over. And answered further, as follows:

"Court: Q. The defendant, Hamer, was sitting by

your side when the juror was selected, wasn't he A. Yes? sir, he was sitting by me when the juror was called, and advised me that Carnes knew him. Q. Notwithstanding Carnes' statement that he did not know Hamer, you took him? A. Yes, sir, because we would have been glad to have had all the jurors acquainted with him. He said nothing of knowing anything about an opinion that Carnes had expressed about the case."

Robinson testified that Carnes made the remark at his blacksmith shop, as set out in the affidavit, some time before the trial.

The juror, Felix Carnes, denied having made the statement, said he did not know Vol Hamer was accused of any crime until he came to court. Had never seen him but once before the trial, and did not remember that until Hamer called his attention to it after the trial. He recited part of this conversation as follows:

"He says: 'I thought I had talked with you once about it. I thought you knew it.' I says: 'You are mistaken.' And he turned around and says: 'No, I am mistaken, it wasn't you. It was some other fellow at Mr. Robinson's blacksmith shop. It wasn't you.' After that he says to me: 'Well, I thought you had heard all about it,' for, he says to me, 'When I saw you come on the witness stand—jury stand, you might call it,' he says: 'I told my attorney not to object to you for you was all right, I thought sure you would hang that jury or turn me loose.' I said, 'I would have been glad to have done it in case you had furnished the right evidence, but in case you didn't I had to go according to the law and the evidence.' And at that time Mr. Will Tennyson come up, and he says: 'How could you see anything else to do, but to hang this man or turn him loose—how could you see any place to find a penitentiary offense?' I says: 'I don't know. It looked to me like it was too light evidence to hang him on.'

"This conversation took place at Newport after the trial. I did not remember that I had ever seen Hamer when I was examined as a juror, nor until after he called my attention to it after the trial; did not know him personally, and never had any conversation concerning Hamer at all."

Appellant made a statement, and did not deny any part

of the conversation as recited by Carnes that occurred between them after the trial.

He knew the juror when he was called and sworn upon his *voir dire*, told his attorney the juror knew him, after Carnes had stated that he did not, and accepted him without further questioning as to his impartiality or incompetency by reason of prejudice; and, having failed to avail himself of the means afforded by law for ascertaining whether Carnes was an impartial juror or not before accepting him, he will not be heard to complain after verdict that the juror was incompetent because of prejudice, and entitled to a new trial on that ground. *Myer* v. *State*, 19 Ark. 165; *Collier* v. *State*, 20 Ark. 50; *Casat* v. *State*, 40 Ark. 514; *Smith* v. *State*, 59 Ark. 136.

Moreover, the trial court examined into the matter fully, and ascertained the facts relating thereto, and decided, as it had the right to do, in the exercise of a sound legal discretion, that the juror had not made the statements attributed to him before the trial, and that no prejudice had resulted to appellant by reason of said juror's service, and denied the motion for new trial, and committed no error in doing so.

It is next complained that the court erred in permitting the verdict to be amended. But it is no longer questioned that the jury may amend its verdict to conform to the finding, and put it in proper form, any time before they have separated and same has been entered of record and the jury discharged. 13 Cyc. 1892; *Levells* v. *State*, 32 Ark. 585; *Gilchrist* v. *State*, 100 Ark. 330.

The evidence unquestionably shows the rape of Charlie Holder by some one, and that she could not possibly have been mistaken in the identity of her assailant if her story is true, neither does it disclose any possible motive for laying the crime at the door of appellant, if he did not commit it, and he can not complain because he was only convicted of an assault with intent to commit rape, when the evidence warranted a conviction for the crime of rape. *Skaggs* v. *State*, 88 Ark. 72; *Pratt* v. *State*, 51 Ark. 167.

Neither was error committed in the court's refusal to grant a continuance. No showing was made of proper diligence exercised to secure the attendance of the absent witnesses, and their testimony was only cumulative of the other

testimony relating to the reputation of the prosecuting witness. *Morris* v. *State,* 103 Ark. 352,

Finding no prejudicial error in the record, the judgment is affirmed.