## PENDERGRASS *v*. STATE.

## Opinion delivered March 5, 1923.

1. CRIMINAL LAW—DEMONSTRATION BY SPECTATORS.—Applause by some of the spectators at the close of an argument by one of the State's attorneys, and even participation therein by a deputy sheriff, which was not general on the part of the spectators, was not so prejudicial to the rights of the accused as to be beyond the power of the court to cure, and its injurious effect was cured where the demonstration. was promptly suppressed by the court, who instructed the sheriff to arrest any one whom he saw applauding and admonished the jury not to allow the applause of the audience to influence them in any way.

2. CRIMINAL LAW—MANIFESTATION IN COURT OF POPULAR SENTIMENT. —A manifestation of popular sentiment in court for the purpose of influencing the decision of a criminal case in a manner calculated to create an abiding bias or prejudice entitles the accused to a new trial.

3. CRIMINAL LAW—DEMONSTRATION IN COURT—DISCRETION OF COURT. —Where the trial court refuses to grant a new trial because of the misconduct of the public at the trial, the Supreme Court will be slow to control his discretion, and will not do so unless it has been abused, resulting in a miscarriage of justice.

4. CRIMINAL LAW—ARGUMENT OF COUNSEL.—A reference by one of the State's attorneys to a demonstration in the court room as being a spontaneous outburst of the honest hearts of the people was improper, but was not so flagrant that its prejudicial effect could not have been removed by appropriate directions to the jury, and does not call for a reversal where accused did not object to the remark nor ask for an instruction to the jury not to consider it.

5. CRIMINAL LAW—NEWLY DISCOVERED EVIDENCE—COLLATERAL MATTER.—In a prosecution for murder, where ill feeling between the parties grew out of the deceased's belief that defendant had seduced his daughter, newly discovered evidence relating to intimacy and familiarity in conduct between the daughter and another man, and to statements of the daughter alleged to show a blackmailing scheme, was collateral and irrelevant to the issue on trial as to whether the accused killed deceased in self-defense, and does not require the granting of a new trial.

6. CRIMINAL LAW—NEWLY DISCOVERED EVIDENCE.—Newly discovered evidence which goes only to impeach the credibility of a witness is not ground for a new trial.

7. CRIMINAL LAW—NEWLY DISCOVERED EVIDENCE.—Newly discovered evidence which was merely cumulative of other evidence adduced at the trial does not call for a new trial.

8. CRIMINAL LAW—NEWLY DISCOVERED EVIDENCE—DISCRETION.—Motions for a new trial on the ground of newly discovered evidence are addressed to the legal discretion of the trial judge; and, unless it appears that there has been an abuse of that discretion, the refusal of a new trial will not be reversed.

9. CRIMINAL LAW—DISCRETION OF COURT—DISQUALIFICATION OF JUROR.—Where accused filed the affidavits of two nonresidents that they had heard a certain juror state that accused ought to be hanged, such juror on his *voir dire* having stated that he had not expressed any opinion, and the juror made affidavit that he had no recollection of having made such a statement, the court's discretion in refusing a new trial will not be reversed.

10. HOMICIDE—INSTRUCTIONS—PREJUDICE.—In a murder trial, where evidence on behalf of the State showed a premeditated killing while that on behalf of the defense showed self-defense, and there was no evidence tending to reduce the offense to manslaughter, any errors in giving instructions on manslaughter or any refusal to instruct thereon were harmless.

11. CRIMINAL LAW—MULTIPLICATION OF INSTRUCTIONS.—Though a requested instruction that, if deceased at the time of the killing was in the act of making a murderous assault upon defendant and attempting to take his life, defendant would not be required to retreat before he was authorized to kill deceased, if need be, to prevent him from killing or doing great harm to defendant, was a correct statement of the law, refusal to give it was not error where the court instructed the jury fully and correctly upon the law of self-defense.

Appeal from Logan Circuit Court, Northern District; James Cochran, Judge; affirmed.

*Robt. J. White, John H. White, W. B. Rhyne, G. C. Carter, John P. Roberts,* and *Evans & Evans,* for appellant.

1. The court erred in refusing to grant the appellant a new trial on account of the demonstration in the court room by the spectators and the deputy sheriff who selected and summoned the talesmen on the jury, and on account of the argument of the State's attorney in urging the jury to convict the appellant because of the demonstration. 108 S. E. 290; 166 Calif. 357, Ann. Cases,

1915-B, 881, and case note at p. 894; Ann. Cas. 1913-E, p. 806, case note; 112 Mo. 277, 20 S. W. 461; 16 Texas Ct. App. 473, 49 Am. Rep. 826.

2. The court erred in refusing to grant a new trial on account of newly discovered evidence. 34 Ark. 632.

3. It was error to refuse a new trial on account of the misconduct and disqualification of the juror Girard. 20 R. C. L. 242-3, § 27; 41 Fed. 676; 12 Am. Dec. 157; 46 Ore. 342, 80 Pac. 660, 114 A. S. R. 873; 69 W. Va. 244, 71 S. E. 609, 50 L. R. A. (N. S.) 958, case note; 19 Ark. 156; 72 Ark. 158; 131 Ark. 404; 150 Ark. 555.

4. The court erred in its instruction on the subject of manslaughter, and in refusing to give the instructions on that subject requested by the appellant. 50 Ark. 545; 74 Ark. 460; 52 Ark. 345; *Id.* 45; 116 Ark. 588; 69 Ark. 134; 82 Ark. 503; 87 Ark. 281.

5. It likewise erred in failing and refusing to correctly instruct the jury on the duty of the defendant to retreat. 62 Ark. 306; 50 Ark. 545.

*J. S. Utley,* Attorney General, and *Wm. T. Hammock,* Assistant, for appellee.

1. The prompt and vigorous reprimand of the audience by the court, his directions to the sheriff and his admonition to the jury, removed any prejudice that might have resulted from the applause. 104 Ark. 162. No objections were made to the argument of the attorney based on the applause, and appellant cannot now complain. 79 Ark. 25; 84 Ark. 128; 120 Ark. 562; 125 Ark. 339; 109 Ark. 159; 120 Ark. 530; 126 Ark. 354. See also 65 Ark. 475; 95 Ark. 321; 94 Ark. 548; 100 Ark. 232.

2. There was no error in refusing to grant a new trial on account of newly discovered evidence. Such evidence, where it goes only to impeach the credibility of a witness, is not a ground for new trial. 72 Ark. 404; 90 Ark. 435; 91 Ark. 492; 96 Ark. 400; 114 Ark. 472; 99 Ark. 407. Motions for new trial on the ground of surprise or newly discovered evidence are addressed to the sound

legal discretion of the trial court, and that discretion, in the absence of abuse, will not be controlled. 41 Ark. 229; 54 Ark. 364; 116 Ark. 558.

3. There was no error in refusing a new trial on account of the conduct of the juror Girard. 19 Ark. 156; 72 Ark. 158; 143 Ark. 178; 133 Ark. 16.

4. Under the testimony the defendant was guilty of murder in the first degree, or the killing was in self-defense, and therefore justifiable. Having been convicted of murder in the second degree, he cannot complain of instructions on the subject of manslaughter. 59 Ark. 431; 91 Ark. 224; 37 Ark. 238; 77 Ark. 247; 105 Ark. 367; 91 Ark. 589; 80 Ark. 495; 104 Ark. 606.

5. The court's instruction covered the subject of the duty to retreat, and it was not required to multiply instructions. 116 Ark. 588.

WOOD, J. On Friday, January 13, 1922, appellant shot and killed Clay McIlroy on the northeast corner of the public square in the town of Ozark, Franklin County, Arkansas. McIlroy at the time was armed with a twelve gauge choke-bore shotgun loaded with B B shot. The appellant used a small automatic pistol. On the northeast corner of the square is situated the People's Bank building. It is a two-story building, the lower story being devoted to the banking business and the upper story containing offices. The appellant, with another lawyer, had an office on the second floor. The stairway leading to the second story was immediately west of the bank building. The appellant fired the shot that killed McIlroy from this stairway. Appellant at the time was some eight or ten steps up the stairway.

A nineteen-year-old unmarried daughter of McIlroy had become pregnant and given birth to a baby on January 23, 1922, in Oklahoma City. She claimed that the appellant was the father of the child, and that she went to Oklahoma City at his suggestion and upon his promise that he would defray the expenses of the trip. Miss McIlroy was staying at her home in Ozark at the

time she had sexual intercourse with the appellant. After she became pregnant she notified him of her condition, but did not tell her father. Her father ascertained her condition after she reached Oklahoma City. She did not tell her father that the appellant was the author of her ruin.

It was the contention of the State that the appellant, without provocation, waylaid McIlroy and killed him at a time when the appellant was in no danger of death or great bodily harm from McIlroy. There was testimony to warrant such contention on the part of the State. On the other hand, it was the contention of appellant that McIlroy knew that his daughter had accused the appellant of being the father of her child, and that because of this McIlroy had threatened the life of the appellant and had taken his gun to the People's Bank, where he transacted his business, and had left the same there to be used by him when the opportunity presented for shooting the appellant; that the appellant had been informed of these threats of McIlroy; that on the day of the killing McIlroy saw appellant standing unarmed, as he believed, near appellant's car in front of the People's Bank; that McIlroy thereupon went and got his gun, and came out of the bank with the gun in a shooting position, and was seeking appellant to take his life; that when the appellant saw McIlroy come out of the door with the gun he left the man with whom he was talking at the edge of the sidewalk and ran up the stairway in an effort to get away from McIlroy; that he lost his footing after he had ascended eight or ten steps, and fell or sank down; that McIlroy pursued along the sidewalk in a trot or run until he came in front of the stairway with his gun in a shooting position, and just as he was in the act of bringing his gun toward the appellant to shoot, the appellant fired the fatal shot in order to save his own life. There was testimony to support this contention of the appellant, and we deem it unnecessary to set forth in detail the testimony in support of the respective contentions.

The appellant was indicted by the grand jury of Franklin County of murder in the first degree for the killing of McIlroy. The venue was changed to the Northern District of Logan County, where the trial was had, resulting in a verdict of guilty of murder in the second degree, and a judgment sentencing the appellant to imprisonment in the State Penitentiary for seven years, from which judgment is this appeal.

We will dispose of the alleged errors in the rulings of the trial court in the order in which they are presented in the brief of learned counsel for appellant.

1. The appellant contends first that the court erred in refusing a new trial on account of a demonstration in the court room by the spectators and the deputy sheriff who selected and summoned the talesmen on the jury, and on account of the argument of Hon. Steel Hays in urging the jury to convict the defendant because of the demonstration. To sustain the above assignment of error, which was made one of the grounds of the motion for a new trial, the appellant attached several affidavits. One of the affidavits stated, in substance, that he heard the argument made by Mr. Wolf, one of the attorneys for the State, and that at the close of his argument a great many persons in the audience engaged in a noisy demonstration by clapping their hands, stamping their feet, and hollering in loud voices; that he saw Guy Lipe, who was sitting on a bench near to, and in plain view, of the jury. He had his hands raised above his head, and was clapping them, and stamping his feet, and in that manner assisting and engaging in the demonstration. Lipe is the chief deputy sheriff of B. B. Foster, sheriff of Logan County. Other affiants corroborated the above statement as to the character of the demonstration in the court room.

Two of the appellant's attorneys stated, in an affidavit in support of the above ground for a new trial, that they were present and heard the argument of Steel Hays, one of the counsel for the prosecution, who stated

in his argument with reference to the demonstration by the audience the following: "It was the spontaneous outburst of the honest heart of the people of this county —of your friends and neighbors."

The court put into the record the following statement: "At the conclusion of the speech of Otha Wolf, an attorney representing the State, there was a sudden outburst of applause by a small portion of the audience located near the east front door and extended to other portions of the audience, but by no means a general applause. Immediately the court rapped vigorously for order, and order was almost immediately restored. The court rebuked the crowd severely for the outburst, directed the sheriff to arrest any one whom he saw applauding and bring them before the court, and directed the sheriff, if another applause occurred, to clear the room of spectators, and admonished the jury that they must not allow the applause of the audience in any way to influence them in their verdict, and said to them that, should they do so, they would be unworthy as jurors, and ought not to be allowed to sit in any case. If the Honorable Steel Hays made the statement in his address to the jury that it was the spontaneous outburst of the honest hearts of the people of this county, of your friends and neighbors, the statement was not called to the attention of the court, and no exceptions were saved to such statement."

The statements of the presiding judge with reference to the character of the demonstration in the court room following the argument of the attorney, Wolf, must be accepted as the facts concerning such demonstration and the rulings of the court concerning the same. The statements show that the outburst of applause was by no means general, and that the trial judge immediately took vigorous action, by way of reprimand to the audience and instructions to the sheriff and admonitions to the jury, to correct any prejudicial effect in the minds of the jury that might have been caused by such demonstration. The demonstration that was made by the audience was exceedingly reprehensible, and if the court had

not promptly, and on its own motion, taken the steps indicated to counteract the prejudice which such demonstrations were calculated to produce in the minds of the jury, we would not hesitate to reverse because of the probable prejudice which might have resulted from such improper exhibition of public sentiment in favor of the prosecution. But the demonstration, as evidenced by the statement of the court, was not of so flagrant a character that any prejudice occasioned by it in the minds of the jury could not be completely removed by the efforts which the trial judge made to eliminate the same. The conduct of the deputy sheriff in charge of the jury was, to be sure, the most culpable of all, because he was a sworn officer of the law, whose duty it was to preserve the utmost impartiality in his conduct before the jury. However, we are convinced that the instructions of the presiding judge to the jury not to allow the applause in any way to influence them in their verdict, and telling them that, if they did so, it would show them unworthy to sit as jurors in any case, were adequate to eliminate from the mind of any sensible and honest juror whatever prejudice might, for the moment, have been lodged in his mind. The manifestation of popular sentiment in a court of justice for the purpose of influencing the decision of a cause is always to be deprecated, and, where such sentiment is voiced in a manner calculated to create an abiding bias or prejudice which enters into the determination of a cause, then the only possible method of obviating the failure in the administration of justice caused by such undue influence is to award a new trial. To anticipate and to prevent such occurrences presents a serious problem, and one ofttimes most difficult, and even impossible, to solve. It would not do to invalidate trials because of some sudden outburst of popular feeling which it is impossible for the presiding judge to control. Much must be left to his judgment and discretion in such cases, and, where he fails to grant a new trial because of such misconduct on the part

of the public, this court will be slow to control his discretion, and will not do so unless it is manifest that same has been abused resulting in a miscarriage of justice. The facts of this record as evidenced by the statements of the trial judge do not warrant us in coming to that conclusion.

Concerning the remarks of counsel for the State in regard to the demonstration, such remarks were, of course, calculated to accentuate in the minds of the jury any prejudice which the demonstration might have produced, but these remarks also were not so flagrant that their prejudicial effect could not have been removed by appropriate directions to the jury. The statement of the trial judge shows that his attention was not directed to these remarks, and counsel for the appellant at the time saved no exceptions to them and did not ask the court to instruct the jury not to consider them. Such being the case, appellant cannot now take advantage of a failure of the trial judge to exclude such remarks, or to reprimand counsel for having made the same. *Smith* v. *State,* 79 Ark. 25; *Bell* v. *State,* 84 Ark. 128; *Wilson* v. *State,* 126 Ark. 354.

2. The appellant next contends that the court erred in refusing to grant a new trial on account of alleged newly discovered evidence. He brings forward to sustain this ground of his motion for a new trial the affidavits of William Bearden, John McCormick, and Mrs. Godwin Lewis. The affidavit of William Bearden shows that he on one occasion observed an intimacy and familiarity in conduct between L. M. Guthrie and Edna Jane McIlroy, which counsel for appellant contends would tend to show that appellant was the victim of a blackmailing scheme on the part of Edna Jane McIlroy, to which Guthrie was a party. The affidavit of Mrs. Lewis shows that she would testify to facts which would tend to prove that Edna Jane McIlroy told her that she had never had intercourse with any man except the appellant, and that appellant forced her to such intercourse

at the point of a gun, and that Miss McIlroy wrote to the appellant demanding money, and that Miss McIlroy's father saw the letter. Such testimony as the above was wholly collateral and irrelevant to the issue as to whether or not the appellant killed McIlroy in self-defense. Moreover, the testimony of these witnesses, even if relevant, was only for the purpose of impeachment. Newly discovered evidence which goes only to impeach the credibility of a witness is not ground for a new trial. *Dewein* v. *State,* 114 Ark. 472.

The affidavit of McCormick shows that he would testify that he witnessed the killing; that "he saw Mc-Ilroy come out of the door of the People's Bank with a shotgun in his hand and heard McIlroy say as he came out, 'I am going to kill the son-of-a-bitch!' That appellant ran from where he was talking with a party across the sidewalk into the stairway; that McIlroy changed the gun from his right hand to his left, put the gun to his left shoulder and ran along the sidewalk with the gun to his shoulder, and as he got in front of the stairway he was bringing the muzzle of the gun around into the stairway when he was shot and fell."

The above testimony was but cumulative of the testimony of several witnesses adduced at the trial which tended to show the circumstances of the rencounter to be substantially as disclosed by the alleged newly discovered evidence of McCormick. Under numerous decisions of this court a new trial will not be granted on the ground of newly discovered testimony which is but cumulative in character. *Hays* v. *State,* 142 Ark. 587; *Huckaby* v. *Holland,* 150 Ark. 85, and many cases cited in 4 Crawford's Arkansas Digest at page 3819.

Motions for a new trial on the ground of newly discovered evidence are addressed to the legal discretion of the trial judge, and, unless it appears from the record that there has been an abuse of that discretion, the ruling of the trial court refusing a new trial for such ground will be sustained. *Anderson* v. *State,* 41 Ark. 229; *Arm-*

*strong* v. *State*, 54 Ark. 364. The court did not abuse its discretion in overruling the motion for a new trial on the ground of newly discovered evidence.

3. Appellant contends that the court erred in refusing a new trial on account of the misconduct and disqualification of juror Joe Girard. The record shows that Girard was selected on the jury that tried the appellant. He was a member of the regular panel, and on his *voir dire* he qualified himself to sit on the jury by stating that he did not know anything about the facts of the case, and had not formed or expressed an opinion as to the guilt or innocence of the appellant, and that, if selected, he would try the case fairly and impartially according to the law and the testimony, and that he was not prejudiced against the appellant. The affidavit of one of the attorneys for the appellant shows that appellant and his counsel did not know at the time Girard was accepted by them as a juror that he had expressed the opinion that the appellant ought to be hung. To sustain this ground of his motion for a new trial, appellant also brought forward the affidavits of two parties to the effect that during the August term of the court, 1922, at which the trial of the appellant was had, and before the trial began, they heard Joe Girard say that he knew Pendergrass and McIlroy, and knew enough about the case to know that Pendergrass ought to be hung for killing McIlroy. To rebut the statements made by the two affiants as to what Girard said, the State adduced the affidavit of Girard in part as follows: "I have read the affidavit of Walter Leach of the county of Wagoner, State of Oklahoma, as the same is copied in the application for a new trial in the case of State of Arkansas v. Willard Pendergrass, and I have no recollection of making such statement to any one." It appears that the affidavits tending to show the prejudice of juror Joe Girard were made by parties who lived in Oklahoma. These affidavits do not state the occupation of the affiants, and no facts are set up that would

tend to advise the court as to the identity of the affiants and the credibility that should be given their affidavits. It is not shown that appellant asked that they be brought before the court for observation and personal examination.

As we have already stated, it was shown by the affidavit of one of appellant's counsel that the juror Girard qualified himself under oath as a juror by answering that he had not expressed any opinion as to the guilt of appellant, and the affidavit of Girard states that he had no recollection of making *such statement to any one* as was attributed to him in the affidavit of Walter Leach. The affidavit of Walter Leach as to what he heard the juror Girard say was in substance and effect the same as the affidavit of Walter Smith, so the denial by Girard that he made *such statement to any one* was tantamount to a denial of both affidavits. The answers to the questions propounded to him on his *voir dire* were in effect a denial that he had made such statements prior to the trial as were attributed to him in the affidavits of Leach and Smith. The court had personal observation of the juror Girard while he was making his answers with reference to his qualification to sit as a juror.

In the early case of *Meyer* v. *State,* 19 Ark. 156, we had under consideration the incompetency of a juror on account of prejudice alleged to have been discovered after the trial and conviction, and among other things we said: "If, in this case, the juror Beard had really and seriously expressed the determination, before the trial, to convict the prisoner at all events, he was guilty of a fraud upon the law, and upon the prisoner's rights, in hypocritically taking upon himself the solemn oath of a juror, and falsely assuming to act as an impartial arbiter of the life or liberty of the prisoner. But it would not be safe to hold that the prisoner, after conviction, could take the *ex parte* affidavits of persons out of doors, to establish the prejudice of the juror, and,

bringing them into court, claim a new trial, absolutely, and as a matter of right, upon such affidavits, as insisted by the counsel of the prisoner in this case. Such a practice might open the door for corruption and perjury.''

The above case is the leading case in our reports on the subject now under review, and contains a learned and thorough discussion of the same. In that case the court held that where the competency of a juror is challenged on the ground of prejudice which was not discovered until after the trial, the trial court might consider the affidavits of parties tending to show such prejudice, and might have the affiants and juror brought before the court for examination concerning the alleged prejudice, and that, after ascertaining all the facts, the court would necessarily have to exercise a sound legal discretion in disposing of the motion. In that case there was nothing in the record to discredit the affidavits tending to show prejudice on the part of the juror. The juror himself whose conduct was impeached was not examined, nor his afidavit taken in rebuttal of the alleged fraud and misconduct practiced upon the court in the concealment of his prejudice.

Such being the state of that record, this court held that the competency of the juror had been impeached, and that a new trial should be had on that account. Chief Justice ENGLISH concluded by saying: ''In this case, nothing appears of record to discredit the affidavits of Addy and Tune, and the court below, perhaps, overruled the motion for a new trial, under the impression that, under our statute, the competency of jurors could, in no case, be impeached after the trial.'' But in the case at bar the juror whose conduct was questioned made an affidavit in rebuttal or contradiction of the charges made against him. It occurs to us that the statement contained in his affidavit was an absolute contradiction of the alleged misconduct set forth in the two affidavits that were filed by the appellant in support of his motion.

The court considered these affidavits in connection with the affidavit of the juror Girard, and held that the competency of the juror had not been impeached. We are convinced that the trial court did not abuse its discretion in holding that the integrity of the trial was not impaired by any alleged concealment or prevarication on the part of Girard in imposing himself upon the panel. See *Vowell* v. *State,* 72 Ark. 158. "On motion for a new trial on the ground that a juror was disqualified by reason of having formed and expressed an opinion that the accused was guilty, a finding of the court, on conflicting evidence, that the juror was not disqualified, is conclusive." *Sneed* v. *State,* 143 Ark. 178. *Wright* v. *State,* 133 Ark. 16; *Van Houser* v. *Butler,* 131 Ark. 404.

4. The appellant next urges that the court erred in its instructions given on the subject of manslaughter, and erred in refusing to grant prayers by the appellant in regard to manslaughter. It is a sufficient answer to this contention to say that the appellant cannot complain of error, if any, in the rulings of the trial court in giving or refusing prayers for instructions on the subject of manslaughter, for, as we view the record in the case, there was no testimony to justify instructions on the subject of manslaughter. Counsel for the appellant, in their statement of the case, correctly say that their contention at the trial was that the appellant "was running to the stairway and up the stairway in an effort to avoid the deceased and to prevent the deceased from shooting and killing him, and that the deceased followed, or went along the sidewalk in front of the bank, in a trot or run, with his gun in a shooting position, until he came in front of the stairway up which the appellant was trying to escape, and just as deceased was in the act of bringing his gun in the stairway toward the appellant to shoot, the appellant fired a shot which resulted in the death of the deceased, and that he fired the shot for

the sole and only purpose of saving his own life from being taken by the deceased.''

As we have already stated, there was testimony to sustain this contention, but there was no testimony whatever to warrant a finding that the appellant voluntarily shot and killed McIlroy in a sudden. heat of passion caused by a provocation apparently sufficient to make the passion irresistible. Nor is there any testimony on behalf of appellant, if believed by the jury, that would warrant the inference that appellant was careless in reaching the conclusion that it was necessary to take the life of McIlroy and acted too hastily in doing so. Appellant either shot and killed McIlroy in his necessary self-defense under the circumstances as detailed by himself and witnesses in his behalf, or else he killed McIlroy, as the State contended, and as the testimony tended to prove, without any provocation whatever, and with malice aforethought, and after deliberation and premeditation. The verdict of the jury has settled the issue thus made by the facts against the appellant by finding him guilty of murder in the second degree, showing that, under the evidence, they believed him guilty of that grade of homicide. If they had not so believed, they should, and doubtless would, have acquitted him, for, if the evidence tending to prove the contention of appellant were believed by the jury, they could not have convicted him of any offense. In this state of the proof the appellant is in no attitude to complain because the court submitted instructions on the subject of manslaughter, which, even if erroneous, would have permitted the jury to find him guilty of a lower grade of homicide than that of which he was guilty under the evidence, if he was guilty at all. The instructions on manslaughter were therefore more favorable to the appellant than he was entitled to under the evidence, which tended to prove that, if guilty at all, he was guilty of murder and nothing less. *Beatty* v. *State,* 77 Ark. 247; *Cook* v. *State,* 80 Ark. 495; *Sexton* v. *State,* 91 Ark. 589;

*Hamer* v. *State,* 104 Ark. 606; *Wilkerson* v. *State,* 105 Ark. 367.

5. Appellant urges, as a ground for reversal of the judgment, that the court erred in failing and refusing to correctly instruct the jury on the subject of the duty of the defendant to retreat. The appellant prayed for instructions which, in effect, declared that if McIlroy, at the time of the killing, was in the act of making a murderous assault upon the appellant and attempting to take his life, under such circumstances appellant would not be required to retreat before he was authorized to shoot and kill McIlroy, but that he had the right to stand his ground, and, if need be, kill McIlroy to prevent him from killing, or doing great bodily harm to the appellant. In this connection the court gave the following instruction:

"15. No one in resisting an assault made upon him in the course of a sudden brawl or quarrel, or upon a sudden encounter, or in a combat on a sudden quarrel, or from anger suddenly aroused at the time it is made, is justified in taking the life of the assailant, unless he is so endangered by such assault as to make it necessary to kill the assailant to save his own life, or to prevent a great bodily injury, and he employed all the means in his power, consistent with his safety, to avoid the danger and avert the necessity of killing. The danger must apparently be imminent and actual, and he must exhaust all means within his power, consistent with his safety, to protect himself, and the killing must be necessary to avoid the danger. If, however, the assault is so fierce as to make it apparently as dangerous for him to retreat as to stand, it is not his duty to retreat, but he may stand his ground, and, if necessary to save his own life, or to prevent a bodily injury, slay his assailant."

The appellant offered only a general objection to the above instruction, and the appellant's prayers raised only the objection that the instruction given by the court did not correctly declare the law applicable to the testi-

mony adduced by the appellant, which tended to prove that McIlroy, at the time appellant shot and killed him, was making a murderous assault upon the appellant. Appellant's prayers for instructions in this connection were correct declarations of the law, but we are convinced that the law embodied in these prayers was fully and correctly declared in the instructions which the court gave.

The concluding portion of instruction No. 15, given by the court as above set forth, correctly stated the proposition of law which the appellant contends the court should have stated, for it tells the jury in substance that, if the assault upon appellant was so fierce as to make it apparently as dangerous for him to retreat as to stand, it was not his duty to retreat, but that he could stand his ground, and, if necessary to save his own life or to prevent great bodily harm, slay his assailant, McIlroy. This certainly accurately declared the law safeguarding all the rights of the appellant, if the jury should find that a murderous assault was made upon appellant by McIlroy, and thus fully covered the evidence tending to sustain his theory that the killing was done in his necessary self-defense. After the court had fairly and fully declared the law applicable to the facts which the testimony adduced by the appellant tended to prove, then it was not error to refuse to multiply instructions covering the same subject. *Stevens* v. *State,* 117 Ark. 64-70; *Dickerson* v. *State,* 121 Ark. 564-70.

The record presents no reversible error in the rulings of the trial court, and its judgment is therefore affirmed.